Good morning, counsel. I'm Michael Levine. I'm representing Mr. Becerra. Could you be sure to talk into the mic? I'm sorry, Your Honor? Speak loudly and into the mic. Yes. I'm Michael Levine, and I'm representing Mr. Becerra. Your Honors, the effect of the district judges not instructing the jury orally was to substantially undermine confidence that the defendant's trial was conducted consistently with due process. I mean that we have a question, and confidence is undermined as to whether the jurors actually heard and read the law that was applicable to the case. Counsel, every juror was asked individually if he or she had read each and every instruction, and some of the instructions were given orally, all the preliminary ones and a few of the others. Why isn't that more than we usually know? We don't know orally whether somebody is making out a grocery list or dozing off because they had a late night the night before. Don't we have at least as much certainty here as we ordinarily do? In some respects, but the important point is this, Your Honor. When the judge asks jurors, have you read the instructions that I sent home, he doesn't ask enough. First of all, where was the juror at home? Was the juror drinking alcohol? Was the juror smoking marijuana, which is now, of course, legal in Oregon? Was the juror playing with his grandchild? Was the juror playing with his dog? Was the juror nodding off? Was he watching HBO? Two things, three things. First, the judge did specifically ask the lawyers whether this was okay, and they both said yes. Essentially. Not essentially. I thought they said yes. They didn't object. Yes. No, I thought they said yes. Yes. So, you know, we're pretty tough about forfeitures versus waivers, but here it was really specific. And could the lawyers not waive it? What if the lawyers really liked us better? Well, Your Honors, in order to be a forfeiture or a waiver, I think the court had a recent case about a month ago. Yes, I know, and I wrote it, and that's why I said we're pretty tough about it. You wrote it. You are tough about it. But one of the things I remember, if I remember correctly, you said it's either a waiver or a forfeiture. I can't remember which. The person had to know what they were waiving. Exactly. So, for example, if the judge had said, counsel, you know what, you have a right to have this thing read orally. I can read these out loud, but let's save some time. I'll just send them home. Then if the defense lawyer had said, yeah, that's a great idea, that's a waiver or a forfeiture. Second of all, what the judge actually did here, the instructions he gave them to read at home were not the ultimate instructions. Ninety-five percent of them. Yeah, but some of them were. Some of them were changed. That seems very confusing to me. I agree. So, but you're not exactly objecting to that. I mean, the whole notion of reading them instructions, whether you read them or give them to them and then say, oh, but no, but I may change them later and then changing them seems at least extremely undesirable. I agree with you. And also consider the fact. But that wasn't your argument. That wasn't my argument, but it's part and parcel of the argument, and I'll add to it now. When the jury has read jury instructions, the jury as a body is there. It is a solemn moment. The jury is focused. The judge is looking at them, reading the jurors, looking at the jurors, seeing if a juror is falling asleep, seeing if a juror is not paying attention, seeing if there's a question. This is a solemn moment when jurors are taking the law from the court. The judge here goes, I'm sending them home, and by the way, I'm not going to quiz you on it. Now, what does that say? Is there any circumstance in which the you began by saying he didn't ask enough questions. Is there any circumstance in which the judge may send the instructions home and then the next day be able to ask a sufficient number of questions to ensure that they have read the instructions? Or is your position that the failure to instruct orally, regardless of the questioning, is a structural error, and therefore that's the end of the inquiry? Yes. In light of Marquez, this Court decided that question in 1993. Sort of. It was an ambiguous decision in my view, because after saying it was structural, the Court then seemed to do a harmless error analysis. That's true, too. More to the point, in 1999, which was later, the Supreme Court in Nieder basically said, for the most part, instructional error is subject to harmless error review and is not structural. And here you have otherwise a model trial. You have an impartial judge, an impartial jury, 100 percent correct instructions insofar as the case comes to us, appropriate evidence. It's all perfect. The only oddity is that three-quarters or so of the instructions were given in only written form. And it seems to me somewhat peculiar to say that that is a structural error. I mean, it doesn't mean that every time it will be harmless, but why isn't it subject to harmless error review? Well, if it's not structural, then it is subject to harmless error review, but it's not harmless. The error here was plain. It's error. We know it's error. It's plain because it was decided in 1993. The judge should have known it. The defense lawyer should have known it. The government should have known it. That was the law. This Court stated the law in 1993. So it's error. It's plain error. Now the question is, does it affect the integrity of the trial? Does it affect substantial rights? Answer, yes. Why? For all the reasons stated in Morris in 1946, for all the reasons stated by the Third Circuit, the judge has to give the law orally so we can be sure the jurors hear the law. We want to know they've heard it. Well, we don't really know they've heard it. That was what I was asking you at the beginning. We have no idea. They're sitting there, and they may be, you know, anxious about their kid at home who has the flu. We don't have any idea whether they're paying attention, whether they understood, whether they are daydreaming. We just don't have any way to know. So we make an assumption. We presume that they're listening and paying attention and can understand stuff that's coming in orally. But it seems to me we actually know more here by having the questioning than we would normally know. I disagree, Your Honor. When you've read something orally, it's true. If the person is deaf, well, he wouldn't be on the jury. But if you've read something orally, as much as humanly possible, you know that the juror has heard what you've said. If you ask someone, did you read last night these 30, this packet of instructions at home, when you know nothing about the home environment, you have no idea. But most of the time, you don't know anything about their reading ability, which is- The Indiana case. Well, I know, but that case, I mean, you can't be advocating for that rule, which is you can't give them the written instructions. That's what that held. Without consent. It was without consent. Right, and there was certainly consent here. Yes. I mean, that seems it was, I guess, a lot more true in 1880 than it is now. Well, what's also- A substantial number of the people couldn't read at all, but still there is, you know, given especially language differences. What's also interesting is that case had no facts. It was very interesting. The Indiana case? The Indiana case. Well, I also would think that the level of literacy in 1860 is different than the level of literacy in the sense that judge here presumed that everybody was literate. That may not have been the case in Indiana in 1860. I don't know about that, Your Honor. I know there's a certain level of- Lincoln taught himself, not much earlier than that. That's true. But at the same time, Shakespeare plays were all around the country, I understand, and people flocked to them. But that was the premise of the opinion, that many of these people literally couldn't read it. But today we have people who, you know, may understand spoken English, but whether they can read written English is less clear. That's a good point, and I adopt it. Counsel, you have a minute left. Do you want to save it for rebuttal? Thank you. Thank you. Good morning. May it please the Court. I'm Tom Ratcliffe on behalf of the government. What Mr. Levine did not acknowledge is that it is his burden in this case, given that we have plain error, and that that burden requires him to persuade the Court that there was actual prejudice. We believe that the Court in- Well, that's the question, not the answer, isn't it? Do you think that because it's plain error, even if this were otherwise structural error, that we still apply the prejudice part of plain error? No. We don't believe that- Well, if we get into structural error, which is something I'm happy to talk about, we think that's a different analysis. My point is that the Court in Marquez said that what is error in this context, what is prejudice in this context, I should say, is the inability to know whether the jurors received the instructions. Marquez stands for the proposition that it is error not to- Is it to receive the instruction or to have read the instructions? It is to have received the instructions. So they took it home and they came back the next day and they didn't read them. That would have been all right because they had the instructions? No. What I'm saying is that in this case, because of the record that allows the Court to know, allows the appellate court and everyone to know that the jurors affirmatively advised the district court that they had read each of those instructions, that that's what takes this case out of the realm of Marquez, and that creates the problem for the defendant. Can I ask a question, if you happen to know? Is this practice particular to Judge Mossman or is it- Mossman. Judge Mossman is- Or is it, are other judges doing it? I do not know. I have no indication that any of the other judges in the District of Oregon are doing it. I thought there was some reference that other judges were doing it as well, maybe in the briefs. Well, I think that Judge Mossman on the record at some point did say that it is his practice to do it this way and he might ask the jurors on the first day or even the final day whether they had read the instructions, but Judge Mossman is no longer doing this and it is the policy of my office that we are to object if he were to propose it again. But the point I was trying to make regarding the defendant's burden is that it's impossible for him to meet his burden of persuasion because the record conclusively demonstrates that each of the jurors read the instructions. Well, I don't know that he does. I mean, even the questioning, it was somewhat coercive. It was not private voir dire in chambers. It was in open court, and I think it would take some courage for a juror to have said, gee, Judge, I was watching TV. I didn't read the instructions. So what else were the jurors supposed to answer? Well, Your Honor, it did happen in open court, and that's absolutely correct. But the benefit of it having happened in open court is that not only did the district court have an opportunity to observe, but the defendant and his lawyer and the government lawyer, in this case that was me, had a chance to observe whether there was any hesitation, whether there was anything beyond the bare answer on the transcript that would have indicated or raised some cause for concern. And we believe that that's the fact that the district court was satisfied with those answers is a sort of implied credibility finding. There was no questioning whether or not they had discussed it with anybody in their homes, whether or not they had looked at dictionaries or any other supporting materials, what time did they do this, this reading. It is really a very incomplete answer. The court is correct, of course. Also, I mean, what concerns me the most is their ability to read it. I mean, people may think they read it, but we know that there are people, unfortunately, in this country who graduate from high school and, you know, can't read a complicated thing. They just can't. And then there are also people with language difficulties, and he didn't go into any of that. Well, Judge Berzon, that gets to the point here that the District of Oregon's jury management plan, juror management plan, which is publicly available and was confirmed by the District of Oregon in 2015 and by the Ninth Circuit Judicial Council in February of 2015, incorporates the requirement in 28 U.S.C. Section 1865b2 that it is disqualifying to serve on a juror, a grand jury, or a pettit jury in the federal system if someone cannot, is unable to read, write, or understand the English language sufficiently to fill out the juror qualification form. And no juror, prospective juror, can get into a courtroom and be chosen in the district. I don't think there's a difference between filling out a jury qualification form and understanding rather involuted written instructions. Well, Your Honor, if we're talking about a baseline compared to the case from 157 years ago. I understand. I'm not talking about that. But I do think that there is a variation in reading ability. And I have another question, which is the one I asked before. I mean, in some ways what bothers me most about this practice, which I'm glad is no longer there, is reading the wrong, having them read the wrong instructions. I mean, that's really disturbing. In other words, the instructions he gave them to read were not the ultimate instructions. Your Honor, that's true. There were three edits. Right. There was essentially the 404B instruction regarding other bad acts. And there were two then minor edits to other instructions. And the Court did read those. He emphasized that. I understand that. But, I mean, if you give somebody a piece of paper and you say, now, you really have to read this and understand it. And did you? Yes. And then you tell them something else orally. Either it would be okay to give them oral instructions at the beginning and then say, I'm going to change them later. I mean, in other words, the whole changing point seems to me to be inherently incredibly confusing. Your Honor, when looking at this issue that you've identified regarding a possible, regarding the possible confusion and the difference here, I think it's important to look back at what we do have in this case is the jury was given a greater opportunity to digest and comprehend and think about these instructions because they did receive them before any evidence came in. And they had three days with them. So they were able to, unlike a normal jury. The written instructions that went to the jury room were the amended ones. Correct. They were each on the final day when they came back before closing arguments. Those of them who brought the draft packet back, the packet was retrieved from them and they were all given individual new copies. And then the final version, and that was the final version, by the way. And did all of them bring the original ones back? The record is unclear on whether they all brought the draft version back. But they were sent back to the jury room, of course, then, with a signed final set of instructions that was complete. And the altered ones were read aloud as well. Absolutely, Your Honor. And so we believe that because all the defendant is relying on here is a parade of imaginary horribles, that he cannot meet his burden of showing actual prejudice. He talks about it in terms of presumed error on page 26 of his brief. But he wants to wish away the colloquy that the court had, the polling process. And he doesn't acknowledge that under Marquez, prejudice is proof that a juror did not read any instructions. We have that proof in this case, Your Honor. Can I ask whether I gather that you're not agreeing or you're objecting to these procedures. Do you agree that this was error? We do. Okay. If you have no further questions, I'm happy to sit down. We ask the Court to affirm. Thank you, Counsel. Mr. Levine, you have about a minute. Wait until you're at the mic, please. Just following up on Judge Rubino's point for just a minute, a tougher case for the defense had the judge taken each juror separately in chambers, sort of individual voir dire. The Court will recall in my brief I gave the Ash psychological experiments, which, frankly, were shocking. When you read them, it's quite extraordinary that people will follow an opinion, even though they know it's wrong, simply because they don't want to be embarrassed in front of a group. Thank you very much. Thank you, Counsel. The case just argued is submitted, and we appreciate the helpful arguments from both of you in this interesting case.
judges: Graber, Berzon, Robreno